**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------X

DAVID PROPIS,

                          Plaintiff,

              v.

MICHAEL CROW, in his individual and
professional capacities, DUNROSS CAPITAL
INC., and TRINET GROUP, INC.,

                         Defendants.

---------------------------------------------------------------X

Civil Action No.:

**COMPLAINT**

**<u>Jury Trial Demanded</u>**

Plaintiff David Propis ("Plaintiff" or "Mr. Propis"), by and through his attorneys, Wigdor

LLP, as and for his complaint against Defendants Michael Crow ("Mr. Crow"), in his individual

and professional capacities, Dunross Capital Inc. ("Dunross"), and TriNet Group, Inc. ("TriNet")

(the two entities together will be referred to as the "Company," and the three Defendants

collectively as "Defendants"), hereby alleges as follows:

<u>**PRELIMINARY STATEMENT**</u>

1.      Although Dunross describes itself as a "team of professionals," Defendant

Michael Crow rules his business by fiat and without transparency, and when Plaintiff David

Propis attempted to hold Mr. Crow accountable for promises he made to employees and business

partners, Mr. Crow breached Defendants' contracts with Mr. Propis.  Mr. Crow also displayed

contempt for Mr. Propis by repeatedly ridiculing and denigrating Jewish people and Mr. Propis's

Jewish religion and heritage.

2.      Mr. Propis is an accomplished fund manager and experienced in the financial

industry.

3.      Mr. Propis joined Dunross based upon Mr. Crow's contractual promises and agreement that he would be an equity shareholder in Dunross and other related entities, and that his employee compensation would be structured "similar [to] a fund or Wall Street bank."

4.      In addition, through multiple legal agreements, Mr. Propis was contractually given equity stakes in Dunross and related entities, which would entitle Mr. Propis to payouts and distributions of profits from fees and other revenues, as well as the value of such equity (reflecting the value of the entities' real estate holdings and other assets) in those entities.

5.      During Mr. Propis's time at Dunross from October 2018 to May 2020, he brought substantial investments into Dunross and its affiliated entities as a senior member of the capital raising group (despite having been hired for an operational role, not fundraising), and also successfully took on the mantel of Head of Construction Management (for which work he received praise from individuals inside and outside the Company).

6.      Before Mr. Propis joined the Company, Dunross had acquired only two properties, both under unfavorable terms.  In the six months after Mr. Propis started there, however, the Company acquired six more properties, due in part to Mr. Propis's tireless efforts.

7.      Despite all his hard work, Defendants denied Mr. Propis his contractually promised compensation and entitlements of equity and revenue shares and related fees (inclusive of brokerage fees, acquisition fees, mortgage commitment fees, property management fees, etc.), due to Defendants' unlawful retaliatory termination of Mr. Propis, as well as breaches of their contracts, and Mr. Crow's breaches of loyalty to the Company.

8.      Mr. Crow repeatedly ignored requests and objections from Mr. Propis about not yet receiving his promised equity share in Dunross and other entities or other contractual

payments through Dunross and related entities (through which entity Mr. Propis also was entitled to a percentage of fees collected on various real estate deals and projects).

9.      In addition, Mr. Propis observed Mr. Crow run the Company in an unethical and arguably unlawful manner, with regard to use of investors' and Company funds and other practices towards employees and business partners (including use of business funds for personal purposes such as vacation, to which Mr. Propis objected to the ire of Mr. Crow), which further demonstrated to Mr. Propis the disregard that the Company's leadership had in connection with its legal obligations and contractual commitments.

10.     Upon information and belief, Mr. Crow diverted corporate opportunities to himself personally and/or wrongfully diverted the assets of the Company in breach of his duty of loyalty to the Company.

11.     In addition to these unlawful business practices, Mr. Crow also regularly made anti-Semitic comments and supposed jokes, including commonly connecting Jews with money-grubbing stereotypes.  This behavior on its own was vile and demeaning, but the aggressive nature of this conduct was compounded by the fact that Mr. Crow was well aware that Mr. Propis is Jewish, and yet Mr. Crow directed much of this conduct directly at Mr. Propis.

12.     Mr. Crow's anti-Semitic views had their most serious impact on Mr. Propis when he terminated Mr. Propis for his repeated requests to be paid the wages he had earned (which was also a violation of the anti-retaliation provisions of the New York Labor Law).

13.     To this day, Mr. Propis has not received any disbursements, payments, revenue shares, or equity to which he is contractually entitled from Defendants and other related entities.

14.     These actions represent only some of the unscrupulous behavior that Mr. Propis witnessed at the Company, but are indicative of the manner in which Mr. Crow runs the Company and acts towards his employees, partners, and investors.

## NATURE OF ACTION

15.     The unlawful discrimination, labor law retaliation, breach of contract, and breach of the duty of loyalty and/or usurpation of corporate opportunity described herein were committed in violation of Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. §§ 1981 *et seq.* ("Section 1981"), the New York State Human Rights Law, N.Y. Executive Law §§ 290 *et seq.* ("NYSHRL"), the New York City Human Rights Law, N.Y. City Administrative Code §§ 8-101 *et seq.* ("NYCHRL"), the New York State Labor Law, N.Y. Lab. Law §§ 198 *et seq.* ("NYLL"), and the New York common law.

## ADMINISTRATIVE PREREQUISITES

16.     Plaintiff will file a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") and seek leave to file an Amended Complaint alleging violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), following the EEOC's issuance of a Notice of Right to Sue.

17.     Following commencement of this action, a copy of this Complaint will be served both on the New York City Commission on Human Rights and the Office of the Corporation Counsel of the City of New York, thereby satisfying the notice requirements of the New York City Administrative Code.

18.     Any and all other prerequisites to the filing of this suit have been met.

## JURISDICTION AND VENUE

19.     The Court has jurisdiction pursuant to 28 U.S.C. § 1331, as this action involves federal questions under Section 1981.

20.     The Court has supplemental jurisdiction over the claims brought under state and local laws, pursuant to 28 U.S.C. § 1367(a).

21.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred in this district.

## PARTIES

22.     Plaintiff David Propis is a resident of the state of New York and a former Managing Director and Partner at Defendant Dunross Capital Inc. and other related entities.  At all relevant times, Plaintiff was an "employee" under all relevant statutes.  Throughout his employment at Dunross, Mr. Propis engaged in work in New York, New York; Mineola, New York; and Ronkonkoma, New York.

23.     Defendant Michael Crow is a resident of the state of New York, the CEO and Founder of Dunross Capital Inc., and supervised Plaintiff during his employment at the Company.  At all relevant times, Mr. Crow was an "employer" under all relevant statutes.

24.     Defendant Dunross Capital Inc. is a Delaware-registered foreign business corporation with its principal place of business in Ronkonkoma, New York during Mr. Propis's employment.  At all relevant times, Dunross was an "employer" under all relevant statutes.

25.     Defendant TriNet is a Delaware-registered foreign limited liability company with operations of business in New York, New York.  At all relevant times, TriNet was an "employer" under all relevant statutes.

## FACTUAL ALLEGATIONS

### I.    MR. PROPIS'S WORK AT THE COMPANY AND PROFESSIONAL BACKGROUND

26.    Before he came to work at the Company, Mr. Propis had worked for more than 20 years in the financial industry, with 10 years as a fund manager (including founding Agile Opportunity Fund, LLC, at which he managed $30 million in customer assets).

27.    After receiving the offer of partnership and lucrative, "Wall Street"-level compensation at the Company in June 2018, Mr. Propis did not pursue at least two other promising and lucrative opportunities, and instead decided to join up with Mr. Crow.

28.    On or around June 8, 2018, Mr. Crow extended a contractual offer of employment to Mr. Propis in an email setting forth his compensation and equity partner status and terms in Dunross and the related holding company for investment properties, Sureste Partners, L.P. ("Sureste").

29.    Mr. Crow described the employment offer as "similar for a fund or Wall Street Bank," and told Mr. Propis, "I want to build generational wealth.  If I make $100 million, you're gonna make $10 million."  This was said by Mr. Crow at a meeting with Mr. Propis at a Houlihan's Bar and Grill, prior to Mr. Propis accepting the job offer.  This statement indicates that the parties' unambiguous understanding was that Mr. Propis would receive a share of Company profits and revenues, including fees collected in connection with projects.

30.    Mr. Propis accepted the offer of employment and started working at the Company in October 2018 as a Managing Director and partner, reporting directly to Mr. Crow and working primarily in New York City (at least to start).

31.     Mr. Propis's role originally was conceived to be acting as Mr. Crow's "right-hand man," getting immersed in the real estate business, and doing whatever needed to be done at the Company.

32.     Mr. Propis was supposed to be Mr. Crow's top lieutenant and work on all aspects of the business, and eventually, several years down the line, run the business. Mr. Crow told Mr. Propis that, in several years, Mr. Crow would become Chairman and hand over daily operational control to Mr. Propis.  At all times before beginning his employment and in numerous conversations after Mr. Propis began working at Dunross, Mr. Crow indicated that Mr. Propis would lead the Company in the future.

33.     Almost immediately after he joined the Company, many various responsibilities fell to Mr. Propis.

34.     In addition to being a senior member of the capital raising group, bringing in substantial investment and helping to coordinate deals (*e.g.*, he brought in $350,000 in equity shortly after starting, as well as the Company's first institutional limited partner ("LP") investor, which helped get two early deals done), it was necessary for Mr. Propis to assume the role of the Head of Construction Management.

35.     Mr. Propis excelled in construction management, a role that he was compelled to take on due to the lack of personnel for the role, and he received effusive praise from both inside and outside the Company for his work in this area.

36.     Early in 2019, Mr. Propis set up office space for the Company in the vicinity of Penn Station in Manhattan.

37.     Mr. Propis also made key hires for the Company, including bringing in an employee who could do financial modeling work.

38.     Mr. Propis also was instrumental in acquiring and even constructing the Company's offices on Long Island (in Mineola and then Ronkonkoma), which greatly cut down Mr. Crow's commute time and created other operational efficiencies.

39.     Mr. Propis was bringing in financing, assisting with research, doing due diligence, finding vendors (contractors, electricians, plumbers, etc.), ordering materials, and even doing property management work (often calling all of the managers daily).  Mr. Propis also routinely resolved code enforcement issues, saving the Company thousands of dollars at numerous properties.  For this work, Mr. Crow named Mr. Propis the Company's "relationship manager" and other names, praising him for all his contributions to the success of the Company.

40.     Mr. Propis also had to take a lead role and/or close out deals such as the Magnolia Square, Oak Tree Village, Park Estates, and both Enclave properties' development, as well as others, even when certain deals were not supposed to have been his responsibility.

41.     Mr. Propis also raised significant funds for the Hairston Woods project.

42.     Indeed, for a time Mr. Crow dubbed Mr. Propis "the Fixer."

43.     That was before, however, Mr. Propis made it clear that he would not stay silent regarding the compensation he was owed, the contractual promises made to him, and agreements which the Company and Mr. Crow had entered into with him.

44.     Although the Company's success is not due solely to his efforts, before Mr. Propis joined, the Company had made only two acquisitions with a single investor under unfavorable terms.  Without Mr. Propis' contributions, it is doubtful that Mr. Crow would have been able to grow the Company at the rate and with the degree of success that it did.

45.     After Mr. Propis joined, the Company quickly acquired six properties over the next six months or so, and Mr. Propis brought in approximately $2.76 million in equity and

preferred investment for the new acquisitions (this resulted in a much higher percentage of fees realized for the Company).

46.     The closing of these acquisitions directly led to institutional investors being attracted to the Company.  Mr. Propis's contributions directly led to numerous acquisitions and still are a major factor in the on-going success of the Company.

47.     Mr. Propis also worked tirelessly and was instrumental in building the Company's track record and reputation, as well as getting its offices in Manhattan and on Long Island built and up and running.

48.     In the summer of 2019, private equity funds approached the Company, which led to the next five properties that the Company acquired, projects and deals that were financed with approximately 90% private equity capital.

## II.     MR. PROPIS'S CONTRACTS

49.     In Defendants' June 8, 2018 written offer to Mr. Propis, the terms were stated very clearly by Mr. Crow.  Mr. Propis accepted the terms both verbally and in writing (*e.g.*, on October 12, 2018, Mr. Propis wrote to the Company: "Thanks again for this week, I am so excited to have joined this team.  Obviously, I accept the terms of employment and partnership. Just for clarity, my start date was October 8th.").

50.     The specific terms expressly written in the Company's offer, which also were expressly accepted, included:

- Compensation of $6,000 base pay per month until at least December 31, 2018, in addition to a non-recoverable draw of $4,000 per month (for a total of $10,000 cash per month, starting in September 2018) [this was later changed to $8,000 per month with no recoverable draw by mutual agreement before Mr. Propis received his first paycheck];

- From December 31, 2018 forward, Mr. Propis's base pay was subject to review, but he would be getting the "Same base as the other Partners;"

- Grant of a 10% equity stake in Dunross Capital Inc. that vested over two years, in quarterly tranches. This equity was expected by the Company to result in profit payouts to Mr. Propis of $100,000 to $150,000 in 2019. The Company reserved 60% of the equity in Dunross for "MC Family LP(me)," identifying Mr. Crow as synonymous with that entity; and

- Equity in Sureste [Partners, L.P.] of 10%, also vesting over two years. The Company estimated that the average equity target per deal closed by that entity would be up to around $2 million, with a target of one deal per quarter over 2018-2019. Again, 50% of the equity in that entity was reserved for and held by "MC Family LP(me)."

51.     The Company has violated the contract by failing to pay to Mr. Propis (and, no doubt, to others as well) the contractually owed portion of the fees collected on the various completed deals.

52.     These amounts are substantial, and include, to date, an appropriate percentage of the equity in and/or fees paid to the Company on projects including, but not limited to: Forest Ridge, Azalea, the Enclave at 3859, the Enclave at Covington, Hairston Woods, Magnolia Square, Oak Tree Village, Park Estates, Park Woods, Hidden Valley/Spring Valley, and Park Valley.

53.     In addition, Mr. Propis should still be receiving a percentage of revenue and fees as an equity partner of the Company, even after his eventual termination (as well as during his employment).

54.     Brokerage fees make up the largest portion of the fees paid to the Company on deals.

55.    Mr. Crow had instructed Mr. Propis to take a course to obtain a real estate license, instructed him to put the license with Oxford Property Group, and paid his monthly fee at Oxford.  Mr. Propis was told to do this by Mr. Crow, purportedly so that Mr. Propis would receive his 10% share of the brokerage fees.

56.    When Mr. Propis did not receive such brokerage fees from the Company and its related entities as contractually owed, he questioned Mr. Crow about this.  Mr. Crow told him that all brokerage fees supposedly were being used as General Partner deposits and investments into the next acquisitions.

57.    Mr. Crow also told Mr. Propis that he would be receiving all fees owed to Mr. Propis as a defined, non-discretionary year-end bonus, "which will be more than your salary." At year-end, though, Mr. Crow gave Mr. Propis a small $10,000 cash bonus and a $10,000 credit to be used to invest into a future acquisition.  This was both a contractual and Labor Law violation.

58.    Instead of paying Mr. Propis his share of the fees, the Company and/or Mr. Crow kept the entirety of all fees generated on these projects, while lying to Mr. Propis about the need for such fees to be held for use in future acquisitions.  During times that he was telling this to Mr. Propis, Mr. Crow purchased a home in East Hampton, a Porsche, and other expensive items, upon information and belief using funds that he had collected from fees paid to and collected by the Company and its related entities, such as Sureste.

59.    The fees paid to the Company on these projects, which were well documented, totaled well over five million dollars, with 10% of such fees therefore amounting to no less than several hundred thousand dollars.

60.     Upon information and belief, Mr. Crow has diverted corporate assets of Dunross to personally controlled entities, including, but not limited to, brokerage fees for real estate transactions, and Dunross's equity interest in the holding company for the investment properties, Sureste Partners, L.P.

III.    **MR. CROW'S ANTI-SEMITIC COMMENTS AND UNLAWFUL TERMINATION OF MR. PROPIS AFTER HE DEMANDED TO BE PAID HIS EARNED WAGES**

61.     Throughout Mr. Propis's employment, Mr. Crow regularly made anti-Semitic comments and repulsive "jokes" regarding Jewish people and stereotypes at the office and elsewhere, while knowing that Mr. Propis was the only Jewish person working at the Company.

62.     Mr. Crow's vile, insulting comments often were directed towards Mr. Propis, including statements such as, "You know, you Jewish people, you're all generally very cheap," and on other occasions mockingly asked Mr. Propis about Jewish prayers related to business or money and whether he wanted to use them at the Company.

63.     Regularly, Mr. Crow will begin commentary about unpleasant business experiences by saying, "With Jews I've done business with… ."  Needless to say, this conduct has no place anywhere, including in the work environment, and greatly affected Mr. Propis in how he believed Mr. Crow, his boss, viewed him.  It also drew a clear boundary between Mr. Propis and the rest of the organization, putting him on the outside of any inner circle.

64.     Mr. Propis spoke with several Company executives about this discriminatory conduct, who agreed that Mr. Crow was acting in an unacceptable and inappropriate manner that indicated animus against Jewish people.

65.     This feeling also was shared by other Company employees who witnessed this conduct by Mr. Crow, including his former executive assistant.

66.     Once Mr. Propis started objecting to the Company's failure and refusal to honor its contractual obligations to him regarding his compensation and equity, Mr. Crow consistently ignored and dodged Mr. Propis's questions.

67.     On at least one occasion, Mr. Crow said that Dunross was supposedly just being used as a "family entity," rather than as part of the business side of the Company.  This was patently and transparently false (*e.g.*, why would such an entity employ so many individuals who work on projects relating only to other entities?), as well as a fraudulent claim made to Mr. Propis and other individuals currently and formerly working at the Company.

68.     Once it became clear that Mr. Propis was going to keep pressing his concerns and objections regarding the contracts and binding promises made to him, Mr. Crow began to subject him to increasing hostility and criticism (including to others inside and outside the Company, harming Mr. Propis's professional reputation).

69.     Mr. Crow also pulled Mr. Propis off of his construction management duties, which Mr. Propis had been forced to assume out of necessity soon after he joined the Company due to mismanagement of this function (and in which role he oversaw the successful completion of hundreds of residential units).

70.     During the summer of 2019, as Mr. Propis continued to object about Defendants' failure to fulfill various contractual promises, Mr. Crow placated him by telling him that his pay would be increased to $150,000 and, once more, that he would receive a year-end bonus greater than the amount of his annual salary (once again promising "Wall Street"-style compensation).

71.     Yet, the Company continued to fail to pay out portions of brokerage fees of which Mr. Propis should have received, on the false and *post-hoc* rationale that he had not sourced the

deals (this is not how equity and partnership would work either generally or under the relevant contracts).

72.     Mr. Crow only made this statement about the brokerage fees once Mr. Propis forced the issue of compensation at the end of the summer of 2019.

73.     Mr. Crow repeatedly and unilaterally attempted to change the terms of Defendants' relationships with Mr. Propis, as well as others at the Company, and with numerous vendors doing business with the Company.  This is a *modus operandi* of Mr. Crow and is in keeping with other fraudulent actions Mr. Propis learned about during his employment.

74.     On or around September 6, 2019, Mr. Propis wrote an email to Mr. Crow noting that he had talked with Mr. Crow about the previously agreed nature of his partnership in the Company and the equity and other compensation that would come with it.

75.     These contractually owed items had not materialized, despite Mr. Propis having been at the Company for a year.

76.     Mr. Propis knew that Mr. Crow likely would react with hostility and retaliation to his having raised and objected to the failure to fulfill the contractual promises made to him.

77.     This fear was reflected in Mr. Propis's plea to Mr. Crow that, "I [Mr. Propis] hope you did not take my coming to you in a negative way at all."

78.     Mr. Propis sent an email with that sentence after several verbal discussions with Mr. Crow over the summer of 2019 about his abusive conduct and failure to honor the commitments and agreements that had been made to Mr. Propis.

79.     In the winter of 2019-2020, the Company improperly reduced and withheld Mr. Propis's pay yet again (despite Mr. Crow's promise of substantially increased compensation),

and Mr. Propis was paid a bonus of $10,000, which paled in comparison to the compensation previously promised to him in comparison and relative to the Company's profits.

80.     Far from Mr. Crow's promises of "Wall Street"-style compensation, in the range of $250,000 to $350,000, the Company even denied Mr. Propis a second $10,000 bonus that was promised to him by Defendants and which was supposed to allow him to invest some money in a future deal.

81.     The Company actually told Mr. Propis at one point in 2020, after Mr. Propis was supposedly "furloughed" by Defendants (he was the only employee in the New York office to be placed on furlough) about this bonus, "No problem, we'll pay it out in the next week."

82.     Needless to say, Mr. Propis is still waiting for that check or wire to arrive.

83.     Each time Mr. Propis approached Mr. Crow or the Company about his equity and owed compensation, including during the last couple of months of his employment, he was met with hostile and aggressive reactions.

84.     Common excuses and deflection from Mr. Crow included statements such as, "I don't want to keep rehashing history.  I want to move forward," and "Why do we have to keep discussing the past?  Let's move forward."

85.     Mr. Crow also commonly dangled "Wall Street"-style bonuses or some other elusive carrot, such as a supposed 20% partnership for Mr. Propis in a new Company division (at other times Mr. Crow offered a 10% partnership in a supposed new division or entity).  This new entity was named Sureste Value Partners, and although Mr. Propis was being treated with disdain at the time, one of Mr. Propis's last activities before he was furloughed was to build the new division's website and meet with a number of crowd-funding groups to expand the network of potential investors for Dunross/Sureste.

86.     It is abundantly clear that Mr. Crow and the other Defendants, tired of Mr. Propis's attempts to realize even some of the compensation and equity to which he is entitled, decided that to get rid of Mr. Propis one way or another, rather than be held to account for his compensation and contractual entitlements to shares of revenue, fees, and equity.

87.     On May 31, 2020, the Company terminated Mr. Propis without explanation or so much as a word from Mr. Crow, who was his direct supervisor and the Company's majority owner.

88.     Despite false denials by Mr. Crow to Mr. Propis about his impending retaliatory termination of Mr. Propis, Mr. Propis (who suspected foul play) called TriNet (the Company's PEO) about his status with the Company in order to verify or disprove Mr. Crow's representations.  TriNet gave Mr. Propis a Case Number that indicated that he was to be taken off payroll and terminated at the end of May 2020.

89.     TriNet followed through on this apparent order from the Company and Mr. Crow, and Mr. Propis's employment and compensation ended with May 2020.

**FIRST CAUSE OF ACTION**
**(Discrimination in Violation of Section 1981)**
***Against All Defendants***

90.     Plaintiff hereby repeats, reiterates, and re-alleges each and every allegation in each of the preceding paragraphs, as though fully set forth herein.

91.     Defendants have discriminated against Plaintiff on the basis of his race and/or ethnicity in violation of Section 1981 by subjecting him to disparate treatment based on the fact that he is Jewish including by, *inter alia*, denying him the same terms and condition of employment, stripping him of his job duties, and terminating him employment.

92.     As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of Section 1981, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, for which he is entitled to an award of damages.

93.     As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of Section 1981, Plaintiff has suffered, and continues to suffer, emotional distress for which he is entitled to an award of compensatory damages.

94.     Defendants' unlawful and discriminatory actions constitute malicious, willful, wanton, and/or reckless violations of Section 1981, for which Plaintiff is entitled to an award of punitive damages.

**SECOND CAUSE OF ACTION**
**(Discrimination in Violation of the NYSHRL)**
***Against All Defendants***

95.     Plaintiff hereby repeats, reiterates, and re-alleges each and every allegation in the preceding paragraphs, as though set forth fully herein.

96.     Defendants have discriminated against Plaintiff in violation of the NYSHRL by denying him equal terms and conditions of employment, including, but not limited to, by terminating his employment because of his Jewish religion, race, and ethnicity.

97.     As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic damages, including, but not limited to, loss of past and future income, as well as compensation and benefits, for which he is entitled to an award of monetary damages and other relief.

98.     As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, severe mental

anguish and emotional distress for which he is entitled to an award of monetary damages and other relief.

99.     Defendants' unlawful discriminatory conduct was intentional, done with malice, and/or showed a deliberate, willful, wanton, and reckless indifference to Plaintiff's rights under the NYSHRL, for which Plaintiff is entitled to an award of punitive damages.

**THIRD CAUSE OF ACTION**
**(Discrimination in Violation of the NYCHRL)**
***Against All Defendants***

100.     Plaintiff hereby repeats, reiterates, and re-alleges each and every allegation in the preceding paragraphs, as though set forth fully herein.

101.     Defendants have discriminated against Plaintiff on the basis of his protected characteristics in violation of the NYCHRL by subjecting Plaintiff to disparate treatment based upon his Jewish religion, race, and ethnicity, including, *inter alia*, terminating his employment.

102.     As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic damages, including, but not limited to, loss of past and future income, as well as compensation and benefits, for which he is entitled to an award of monetary damages and other relief.

103.     As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, mental anguish and emotional distress for which he is entitled to an award of monetary damages and other relief.

104.     Defendants' unlawful discriminatory conduct was intentional, done with malice and/or showed a deliberate, willful, wanton, and reckless indifference to Plaintiff's rights under the NYCHRL, for which Plaintiff is entitled to an award of punitive damages.

**FOURTH CAUSE OF ACTION**
**(Retaliation in Violation of NYLL)**
*Against All Defendants*

105.    Plaintiff hereby repeats, reiterates, and re-alleges each and every allegation in each of the preceding paragraphs, as though fully set forth herein.

106.    Defendants have retaliated against Plaintiff in violation of NYLL by subjecting Plaintiff to adverse actions because he engaged in protected activity when he complained about not receiving his contractual, earned and/or promised compensation, including, *inter alia*, terminating his employment.

107.    As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of NYLL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, for which he is entitled to an award of damages.

108.    As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of NYLL, Plaintiff has suffered, and continues to suffer, emotional distress for which he is entitled to an award of compensatory damages.

109.    Defendants' unlawful and discriminatory actions constitute malicious, willful, wanton, and/or reckless violations of NYLL, for which Plaintiff is entitled to an award of punitive damages.

**FIFTH CAUSE OF ACTION**
**(Breach of Contract)**
*Against Defendant Dunross Capital Inc.*

110.    Plaintiff hereby repeats and re-alleges each and every allegation in all of the preceding paragraphs, as though fully set forth herein.

111.    Plaintiff entered into a contractual agreement with Defendants Dunross Capital Inc., Sureste Partners, MC Family and other related entities, on or about October 8, 2018.

112.    Defendant breached the contractual agreement by unilaterally deciding to pay Plaintiff less than what he was entitled to under the contractual agreement, and not granting Plaintiff his equity interest and earnings in Dunross Capital Inc., as well as other related entities such as Sureste.

113.    As a direct and proximate result of Defendant's breaches of the contracts, Plaintiff has suffered, and continues to suffer, economic harm, for which he is entitled to an award of damages to the greatest extent permitted under law.

**SIXTH CAUSE OF ACTION**
**(Breach of Duty of Loyalty and/or Usurpation of Corporate Opportunities)**
***Against Defendant Crow***

114.    Plaintiff hereby repeats and re-alleges each and every allegation in all of the preceding paragraphs, as though fully set forth herein.

115.    Defendant Crow, as an officer and partner of the Dunross Capital Inc., owed a duty of loyalty to the Company.

116.    Upon information and belief, Defendant Crow, in breach of his duty of loyalty, has diverted corporate assets from Dunross to personally controlled entities, including, but not limited to, brokerage fees for real estate transactions and Dunross's equity interest in the holding company for the investment properties, Sureste Partners, L.P.

117.    Plaintiff was harmed by Defendant's breaches of loyalty since he did not receive his portion of the brokerage fees that were usurped or diverted from the Company, and the value of his equity in Dunross was impacted by Defendant Crow's usurpation of corporate opportunities and diversion of corporate income and assets (including Dunross Capital's equity interest in Sureste Partners, L.P.).

118.     Plaintiff hereby invokes his accounting rights as a shareholder in Dunross, and

demands a copy of the monthly balance sheet (including all fees generated and itemized payroll),

profit and loss statements, payments and disbursements and/or distributions made to individuals

and entities (including to Mr. Crow and other entities affiliated with him and his family

members), and tax returns from October 2018 through to the present.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays that the Court enter judgment in his favor and against

Defendants, containing the following relief:

A.       A declaratory judgment that the actions, conduct and practices of Defendants

complained of herein violate the laws of the United States, the State of New York, and the City

of New York;

B.       An injunction and order permanently restraining Defendants and their partners,

officers, owners, agents, successors, employees, and/or representatives, and any and all persons

acting in concert with them, from engaging in any such further unlawful conduct, including the

policies and practices complained of herein;

C.       An award of damages against Defendants, or any jointly or severally liable entity

or person, in an amount to be determined at trial, plus prejudgment interest, to compensate

Plaintiff for all monetary and/or economic damages, including, but not limited to, loss of past

and future income, equity interests, wages, compensation, seniority, and other benefits of

employment;

D.       An award of damages against Defendants, or any jointly or severally liable entity

or person, in an amount to be determined at trial, plus prejudgment interest, to compensate

Plaintiff for all non-monetary and/or compensatory damages, including, but not limited to,

compensation for his mental anguish and emotional distress, as well as damage to his reputation, under applicable law;

E.      An award of damages for any and all other monetary and/or non-monetary losses suffered by Plaintiff, including, but not limited to, loss of income, earned bonus pay, reputational harm, and harm to professional reputation, in an amount to be determined at trial;

F.      An award of damages for any harm caused by Defendant Crow's breaches of loyalty and/or usurpation of corporate opportunities.

G.      A declaratory judgment and/or injunctive relief awarding Plaintiff the equity interest to which he is entitled in Dunross Capital Inc. and any equity interest in Sureste or other entities to which Plaintiff was entitled and/or that he would have received had he remained employed by the Company and Defendants;

H.      An award of punitive damages and any applicable penalties and/or liquidated damages, in an amount to be determined at trial;

I.      Prejudgment interest on all amounts due;

J.      An award of fees and costs that Plaintiff has incurred in this action, including, but not limited to, expert witness fees, as well Plaintiff's reasonable attorneys' fees and costs to the fullest extent permitted by law; and,

K.      Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated: January 22, 2021
New York, New York

Respectfully Submitted,

**WIGDOR LLP**

By: _____
Lawrence M. Pearson

85 Fifth Avenue
New York, NY 10003
Telephone: (212) 257-6800
Facsimile: (212) 257-6845
lpearson@wigdorlaw.com

*Counsel for Plaintiff*